**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **PRIMACY ENGINEERING, INC.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.** \_1:18-cv-00\_129 |
| | § | |
| **SAN ENGINEERING; CHI WON LEE, an** | § | |
| **individual; JK OCEANICS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**INTRODUCTION**

1.      This case is about defendant SAN Engineering's scheme to steal the trade secrets and goodwill of its competitor, plaintiff Primacy Engineering, Inc.   While this case involves Korean hovercrafts and international arms controls, the real story is about how SAN Engineering, with the help of Primacy's former employee, Chi Won Lee, relied on robbery and shortcuts instead of hard work to get ahead.  SAN Engineering's unlawful actions and theft could cause Primacy's downfall and the loss of twenty jobs.

2.      For many years, Primacy's predecessor, GMB (USA), Inc. ("GMB-USA"), successfully won lucrative contracts to supply key components for South Korean military hovercrafts that were being made by the massive conglomerate Hanjin Heavy Industries Corporation ("Hanjin").[1]  Over the course of decades, the people behind GMB-USA, and later Primacy, built valuable goodwill with Hanjin that has been critical to Primacy's success.

3.      In the course of its work for Hanjin, GMB-USA and its business partner contracted with the U.S. government to acquire a technical data package, which GMB-USA modified for its

---

[1]      Primacy was formed in or around November of 2015.  On or about January 2, 2017, Primacy obtained much of GMB-USA's assets, including its licenses, trade secrets and inventories, through a material purchase agreement.

work for Hanjin.  This package, as modified by GMB-USA, was the company's trade secret. GMB-USA's proposals to Hanjin and its pricing were likewise trade secrets.

4.      Between 2011 and 2015, defendant Chi Won Lee worked for GMB-USA.  At the start of his employment, Lee signed a non-disclosure agreement in which he agreed, among other things, to keep GMB-USA's trade secrets and proprietary information confidential.  During his time at the company, Lee had access to the company's confidential and proprietary data.  When Lee left the company, he took his company-owned computer with him.  At the time, Lee claimed he deleted the company's data.  But Primacy now realizes, upon information and belief, that Lee preserved GMB-USA's confidential data and trade secrets for later use.

5.      In 2015, Lee joined SAN Engineering, Primacy's competitor.  Upon information and belief, SAN Engineering hired Lee to use the information he obtained at Primacy to help it win military contracts.  And in 2017, Lee came through.  Hanjin solicited bids for a new military contract.  As the sole legitimate owner of the data needed to get the job done, Primacy believed it was positioned for another rewarding contract.  But unbeknownst to Primacy, SAN Engineering's use of the trade secrets Lee stole from Primacy enabled SAN Engineering to submit competing proposals.

6.      With Primacy's data and trade secrets in hand, SAN Engineering secured a contract with Hanjin that made use of the proprietary data and trade secrets that Lee had stolen.  SAN Engineering was aided, and continues to be aided, by defendant JK Oceanics, LLC, a Texas-based company owned by two other former employees of Primacy that was, upon information and belief, formed specifically to assist SAN Engineering on this contract.  JK Oceanics promised to export military components to SAN Engineering, despite the fact that it lacks the export licenses it needs to export these parts for military use.

7.      By this lawsuit, Primacy seeks relief from the defendants' theft and Lee's betrayal. Primacy alleges upon personal knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## THE PARTIES

8.       Primacy is a corporation organized and existing under the laws of the State of New Jersey with a place of business at 560 Sylvan Ave., Suite 1212, Englewood Cliffs, New Jersey 07632.  Primacy owns the trade secrets at issue in this case.

9.       SAN Engineering is a Korean company, the specific legal status of which is unknown, with a principal place of business at 607, Yatap-dong, Bundang-gu, Seongnam-si, Gyeonggi-do, Korea.

10.       Chi Won Lee is an individual who, on information and belief, is currently residing in South Korea.  Lee's current address in South Korea is unknown to Primacy.

11.       JK Oceanics, LLC, is a limited liability company registered to do business in the State of Texas with a principal place of business at 700 Lavaca St. Ste 1401 Austin, TX 78701-3101.  On information and belief, JK Oceanics is owned, operated, and/or controlled by two former Primacy employees: Ji Min Justin Kwon and Jay Kim.

## JURISDICTION AND VENUE

12.       Primacy's first cause of action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.  This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental subject matter jurisdiction over Primacy's pendent state law claims under 28 U.S.C. § 1367.

13.       Alternatively, this court has federal diversity jurisdiction over this action under 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

14.       Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this District, and Primacy's misappropriated trade secrets were shared with JK Oceanics employees working in this district.

15.       This Court has personal jurisdiction over JK Oceanics because it is, on information and belief, a Texas limited liability company, registered to do business in the State of Texas, and with a principal place of business located within the Western District of Texas.

3

16.     This Court has personal jurisdiction over Lee and SAN Engineering because, on information and belief, they have engaged and continue to engage in contracts and ongoing business relationships with JK Oceanics and have engaged in efforts in combination with JK Oceanics to exploit the misappropriated trade secrets belonging to Primacy.

17.     This Court also has personal jurisdiction over Lee because he executed a non-disclosure agreement with Primacy's predecessor-in-interest in which he consented to the jurisdiction and venue of any United States District Court.

## FACTUAL ALLEGATIONS

**A.     For Over Ten Years, Primacy and Its Predecessor Have Supplied Critical Hovercraft Parts to the South Korean Navy**

18.     GMB-USA, Primacy's predecessor, was a systems integrator specializing in marine industrial equipment.  It focused on military projects, including projects for the Republic of Korea Navy ("ROKN").  GMB-USA maintained its principal place of business in New Jersey, but also had a sister entity, GMB, and office in South Korea.

19.     Beginning in 2004, GMB-USA provided essential systems that Hanjin, a South Korean company, used in fast-landing hovercraft that it manufactured for the ROKN through an endeavor known as the LSF-II project.  The hovercrafts themselves are called "LSF-IIs."

20.     The ROKN first engaged Hanjin to build LSF-IIs for it in 2004.  Hanjin designed the LSF-II to work with the ROKN's Dokdo-class amphibious assault ships, which Hanjin also manufactured.  The LSF-II craft can carry a maximum load of fifty-five tons, land on hostile beaches at forty knots, and tread shorelines with limited access.

21.     Hanjin based its design for the LSF-II on the United States Navy's Landing Craft Air Cushion ("LCAC") hovercraft.  In the United States, the International Traffic in Arms Regulations ("ITAR") restricts and controls the export of defense and military related technologies to safeguard national security and further foreign policy objectives.  Hanjin's efforts to model the LSF-II on the United States Navy's LCAC hovercraft implicated these regulations.  For example, Hanjin wanted to use integral systems and proprietary designs that stemmed from the LCAC.

4

22.     Hanjin contracted with GMB-USA in October 2005 to help it obtain the technology it needed in a manner that complied with ITAR and related U.S. laws.  Throughout the process, GMB-USA worked diligently to maintain compliance with the applicable regulations.

23.     Hanjin's contacting GMB-USA was not fortuitous.  The principals of GMB had spent decades working with the South Korean military-industrial complex.  By this time, GMB had built a reputation for excellence.

24.     Hanjin awarded GMB-USA contracts to provide the Auxiliary Power Units ("APU"), Integrated Control Alarm Monitoring Systems ("iCAMS"), and Switchboard Electrical Distribution Systems ("SWBD") for the LSF-II, in addition to some smaller less integral systems such as the heating, ventilation and air conditioning system ("HVAC") and the junction boxes. ITAR governed the export of these parts and systems.  GMB-USA obtained the licenses it needed from the governing U.S. agencies to export these parts to Hanjin.

25.     The components that GMB-USA provided to Hanjin are at the heart of the LSF-II vessel.  The APU is the LSF-II's primary power source.  It produces electrical power to run the LSF-II's main systems.  The APU also provides power for the pneumatic pressure that starts the engines.  The iCAMs control the vessel's key systems including command, control, computer, communications, and navigation.  The SWBD is the electrical power distribution system.  GMB-USA worked closely with manufacturers in the design of these critical components and took care to ensure that they were engineered to work in sync with each other.

26.     Hanjin contacted GMB-USA to get its help in exporting these military components. But GMB-USA still had to go through a rigorous contract bidding process to secure the contract.

**B.     In the Development of the SWBD Electrical Power Distribution System, Primacy Obtained and Developed Confidential Trade Secrets**

27.     As stated, one of GMB-USA's contracts with Hanjin involved the production and export of the SWBD Electrical Power Distribution System.  In the course of this contract, GMB-USA spearheaded the SWBD specifications for the LSF-IIs.

5

28.     In February 2006, GMB-USA entered into a contract with Alion Science and Technology Corporation ("Alion") to help it develop the SWBD specifications.  The two companies worked together and put significant time, labor, and expense into the design and development of these specifications.

29.     The specifications were principally based on a technical data package for the LCAC that was provided to GMB-USA and Alion via an agreement with the U.S. Navy.  At the time, while not classified, the LCAC data package was not generally available and could only be received through an agreement with the U.S. government.  Obtaining an agreement with the U.S. government for military parts specifications, such as the LCAC designs, required GMB-USA to obtain licensing.  The data package included design specifications for the SWBD.  For example, the package included schematics, equipment drawings, and technical operation descriptions. These documents were marked with distribution statements identifying the content as ITAR-controlled data, which could only be used with the permission of the U.S. Navy.  The entire data package, as modified by GMB-USA and Alion for GMB-USA's work for Hanjin, was GMB-USA's trade secret.

30.     GMB-USA's proposals to Hanjin for the work it performed and the prices charged by Primacy to Hanjin for the SWBD and other projects were both trade secrets that remained confidential.  The pricing information was not generally available in the industry and GMB-USA took reasonable steps to protect this information, including keeping the information secret from its competitors.  Further, GMB-USA's goodwill with Hanjin was a valuable corporate asset solely belonging to GMB-USA.

31.     Between 2006 and 2013, after securing its contract with Hanjin, GMB-USA delivered multiple shipsets[2] of APUs to Hanjin.

## C.     Lee Accessed GMB-USA's Trade Secrets During His Employment and Stole Them When He Left the Company

---

[2]     A "shipset" is admiralty parlance for the number of ship parts necessary to make a ship whole.

32.     Lee was an employee with GMB-USA between 2011 and 2015.[3]     During his employment at GMB-USA, Lee worked as a team manager for the company's Defense Business Team.

33.     On January 17, 2011, at or around the start of his employment with GMB-USA, Lee reviewed and signed a non-disclosure agreement (the "NDA").  The purpose of this agreement was to protect GMB-USA's trade secrets and confidential information.

34.     The NDA was translated into Korean.  Lee reviewed and signed both the English and Korean versions.

35.     Paragraph 1 of the NDA defines "Confidential Information" broadly to include "information or material that is commercially valuable to Company and not generally known or readily ascertainable in the industry."  The paragraph then provides the following non-exhaustive examples of some of the confidential information that Lee would be exposed to during his employment:

(a)     technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)     information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

---

[3]     Before working for GMB-USA, Lee worked with GMB, GMB-USA's sister company in Korea, from 2005-2009.

(c)     information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)     information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)     any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

36.     Paragraph 2 of the NDA states: "Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent.  Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company."

37.     Paragraph 3 of the NDA governs the return of materials.  This provision stated: "When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information.  Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

38.     Paragraph 4 of the NDA makes it clear that Lee's obligation to keep Primacy's trade secrets and proprietary information confidential would survive the end of his employment. This paragraph stated: "Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret."

39.     Paragraph 5(f) of the NDA governs indemnity for unlawful disclosures of trade secrets.  It states: "Employee agrees to indemnify Company against any and all losses, damages,

claims or expenses incurred or suffered by Company as a result of Employees' breach of this Agreement."

40.    Paragraph 5(g) of the NDA governs attorney fees and expenses.  It states: "In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures."

41.    As an employee with GMB-USA, Lee had unfettered access to confidential and proprietary data relating to the projects GMB-USA completed for Hanjin's LSF-IIs, including GMB-USA's work on the APUs, iCAMS, and SWBDs.

42.    Among other things, Lee had access the LCAC data package that GMB-USA and Alion had obtained and modified for GMB-USA's proposal to Hanjin.  As stated, this package was GMB-USA's trade secret.  Lee also had access to other confidential trade secrets that belonged to GMB-USA, including its proposals to Hanjin and its pricing information.

43.    When Lee left the company in 2015, he took his company-owned computer with him.  Lee told GMB-USA that he had deleted all of the company's information off of the computer.  Upon information and belief, however, Lee lied to the company, and the computer Lee took still contained GMB-USA's confidential and sensitive data as well as its trade secrets.

44.    Lee's retention of Primacy's computer containing company information violates paragraph 3 of the NDA.

45.    In 2015, Lee joined SAN Engineering, Primacy's competitor, as a technical adviser. Upon information and belief, SAN Engineering hired Lee to provide consulting services relating to the LSF-IIs and its power systems, including the SWBD, based on Lee's knowledge of the LSF-II program, Hanjin's bidding process, and, most importantly, GMB-USA's designs and previous successful proposals.

46.    Lee is also the owner and operator of a Korean company named Oceanics, which is located at #905, 35, Centum dong-ro, Haeundae-gu, Busan, Korea.  Upon information and belief, Lee has used Oceanics as another mechanism for disrupting Primacy's business relationships with its suppliers and partners.

9

**D.**     **SAN Engineering Used The Trade Secrets That Lee Stole From Primacy To Win Contracts With Hanjin at Primacy's Expense**

47.     The South Korean Navy liked their hovercrafts and approached Hanjin to make more LSF-IIs.  Sometime in or around 2014, Hanjin reached out to previous sub-contractors, including GMB-USA, to determine feasibility for production of the necessary components.

48.     In January 2016, the South Korean government formally budgeted for the construction of two additional LSF-IIs.  The South Korean Government and Hanjin then entered into a contract for their production.

49.     Hanjin began soliciting proposals from qualified bidders, including Primacy, for work on the new LSF-IIs.[4]  Because of its predecessor's work, Primacy was a "preferred bidder." The specifications for power distribution systems that Hanjin sent to bidders were identical to the ones that Hanjin had used for the LSF-IIs it built a decade earlier.  In other words, Hanjin's needs for the SWBD and related components were exactly the same.  This created a tremendous business opportunity for Primacy.

50.     Primacy developed a set of technical and performance proposals for the power distribution systems and submitted them to Hanjin in April 2017.  Primacy used the LCAC proprietary data that GMB-USA and Alion had acquired and modified as the basis for its proposals. Additionally, Primacy assured Hanjin that, like its predecessor GMB-USA, it would work diligently to comply with ITAR and related U.S. laws.

51.     Despite the fact that it was the only company with legitimate access to LCAC data, Primacy was not the only company to submit proposals to Hanjin.  Primacy learned in May 2017 that it had competition from SAN Engineering.  That month, SAN Engineering submitted a proposal to Hanjin to provide SWBDs for the LSF-IIs.  Upon information and belief, SAN Engineering used proprietary data that Lee stole from Primacy in this proposal.

---

[4]     Primacy became a qualified bidder through its acquisition of GMB-USA.

52.     Late that year, in December 2017, Primacy learned that Hanjin had awarded SAN Engineering a contract for the SWBDs.  And in recent weeks, Hanjin and SAN Engineering have engaged in talks to finalize this contract.

53.     As stated, Hanjin's specifications for the power distribution systems were identical to those it had used a decade earlier.  GMB-USA and Alion contracted with the U.S. Government to obtain data regarding the LCAC since the LSF-II designs were based on the U.S. Navy's LCAC hovercraft.  GMB-USA and Alion then modified the LCAC designs for use with the LSF-IIs. GMB-USA could not have submitted a proposal without this data.

54.     The data regarding the LCAC hovercraft remained confidential in 2017 (and, upon information and belief, continues to remain confidential).  Accordingly, without the benefit of this data from the U.S. Navy's LCAC, it would be impossible for any company to submit responsive proposals to Hanjin.  Given that SAN Engineering had not contracted with the U.S. Navy for this information, or obtained the necessary licensing for compliance with ITAR regulations, the only feasible way it could have acquired this proprietary design, and submitted a technically compliant proposal to Hanjin, would have been by stealing it from Primacy through its hiring of Lee.

55.     Within the last several months, SAN Engineering has reached out to JK Oceanics to help it obtain the parts it needs for the SWBDs.  Upon information and belief, to ensure that it is obtaining the right components, SAN Engineering is sharing Primacy's proprietary data and trade secrets with JK Oceanics.  Over the last several months, JK Oceanics has contacted several U.S. vendors to inquire about purchasing components for SAN Engineering.

56.     JK Oceanics is not a disinterested third party.  Rather, JK Oceanics is owned and operated by a former disgruntled employee of GMB-USA, Kwon.  Kwon worked at GMB-USA from about 2011 to 2015.  Like Lee, Kwon had access to confidential and proprietary data relating to the work GMB-USA completed for Hanjin.  Accordingly, Kwon is aware that the data being provided to JK Oceanics from SAN Engineering, and subsequently used by JK Oceanics, is Primacy's proprietary data and trade secrets.  Upon information and belief, JK Oceanics was created for the sole purpose of acquiring components to assist SAN Engineering in performing on

11

its contract with Hanjin.  Kwon hopes that JK Oceanics, like SAN Engineering, can capitalize on Primacy's stolen trade secrets.

57.     Upon information and belief, JK Oceanic's decision to use the word "Oceanic" in its name reflects the company's close relationship with Lee.  As stated, Lee owns a company in South Korea called "Oceanic."  JK Oceanic therefore has the same name, except that the word "Oceanic" is preceded by Kwon's intials ("JK").

58.     Upon information and belief, JK Oceanics does not have the requisite export licenses to supply controlled parts to SAN Engineering or Hanjin for military use.  Accordingly, it appears that JK Oceanics and SAN Engineering are attempting to illegally export military components in violation of ITAR.

59.     Primacy employs about fourteen people in New Jersey and six people in South Korea.  Like GMB-USA, a critical part of Primacy's business operations is dependent upon Primacy's relationships with foreign military contractors.  By far the most lucrative and important relationship for Primacy is Hanjin.  Loss of business with Hanjin could mean an end to Primacy's existence.  Lee and SAN Engineering's theft of Primacy's trade secrets has placed Primacy at risk.

60.     SAN Engineering, Lee, and JK Oceanics have jeopardized Primacy and Hanjin's long-standing business relationship and robbed Primacy of the opportunity to win rewarding contracts.  And without these contracts, Primacy will also miss out on income derived from supply contracts, technical design consulting, end-user training, and maintenance assistance.

61.     Upon information and belief, SAN Engineering and Lee, with the help of JK Oceanics, have crafted and brilliantly executed their entire course of conduct to bring about the result SAN Engineering has now secured: cutting Primacy out of military contracts.

## FIRST CLAIM FOR RELIEF

**Trade Secret Misappropriation Under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836 et seq.)**

62.     Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

63.     Primacy owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Simply by way of example, Primacy has trade secrets in its proprietary proposals (such as marketing material), its pricing information for the SWBD, and, indeed, the very business opportunity with Hanjin.

64.     Primacy's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

65.     Primacy has taken reasonable measures to keep such information secret and confidential.  Due to these security measures, Primacy's confidential and proprietary trade secret information is not available for others to use through any legitimate means.

66.     Primacy's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

67.     In violation of Primacy's rights, Defendants SAN Engineering and Lee misappropriated Primacy's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged above.  Defendants SAN Engineering and Lee used and disclosed Primacy's trade secrets to others, including Defendant JK Oceanics, without Primacy's express or implied consent, knowing, or with reason to know, that the knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, or was derived from or through a person who owed a duty to Primacy to maintain the secrecy of the trade secrets or limit their use.  Similarly, JK Oceanics knew or should have known under the circumstances that the information misappropriated by Defendants SAN Engineering and Lee were trade secrets.  Further, Defendants have used, and continue to use, Primacy's trade secrets to pursue contracts with Hanjin without Primacy's consent.  Misappropriating Primacy's trade secrets saved each of the Defendant's substantial time and money in pursuing these contracts.

13

68.     Defendants SAN Engineering's and Lee's misappropriation of Primacy's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Defendants SAN Engineering and Lee have attempted and continue to attempt to conceal the trade secrets' misappropriation.

69.     If Defendants are not stopped, Defendants will continue to misappropriate and use Primacy's trade secret information for their own benefit and to Primacy's detriment.

70.     As the direct and proximate result of Defendants' conduct, Primacy has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Primacy's remedy at law is inadequate, Primacy seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Primacy operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.  The equitable relief sought by Primacy includes but is not limited to the following:

      a.     An injunction barring SAN Engineering from using Primacy's proprietary information; and

      b.     An order requiring SAN Engineering to (1) destroy any proprietary information belonging to Primacy that is in SAN Engineering's possession, (2) withdraw from any contracts with Hanjin for work relating to to the LSF-IIs, (3) withdraw any proposals it submitted to Hanjin for work relating to the LSF-IIs, (4) inform Hanjin that its proposals contained proprietary information belonging to Primacy, which SAN Engineering unlawfully used without Primacy's permission, and (5) terminate its contractual relationship with Lee.

71.     Primacy has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## SECOND CLAIM FOR RELIEF

**Trade Secret Misappropriation Under the New Jersey Uniform Trade Secrets Act (Against Defendants SAN Engineering and Lee)**

72.     Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

73.     Primacy owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Simply by way of example, Primacy has trade secrets in its proprietary proposals (such as marketing material), its pricing information for the SWBD, and, indeed, the very business opportunity with Hanjin.

74.     Primacy's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

75.     Primacy has taken reasonable measures to keep such information secret and confidential.  Due to these security measures, Primacy's confidential and proprietary trade secret information is not available for others to use through any legitimate means.

76.     In violation of Primacy's rights, Defendants SAN Engineering and Lee misappropriated Primacy's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged above.  Defendants SAN Engineering and Lee used and disclosed Primacy's trade secrets to others, including Defendant JK Oceanics, without Primacy's express or implied consent, knowing, or with reason to know, that the knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, or was derived from or through a person who owed a duty to Primacy to maintain the secrecy of the trade secrets or limit their use.  JK Oceanics knew or should have known under the circumstances that the information misappropriated by Defendants SAN Engineering and Lee were trade secrets.

77.     Defendants have used, and continue to use, Primacy's trade secrets to pursue contracts with Hanjin without Primacy's consent.

78.     Misappropriating Primacy's trade secrets saved each of the Defendants substantial time and money in pursuing these contracts.

79.     Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Primacy's knowledge or consent.

80.     As a direct and proximate result of Defendants' conduct, Primacy is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.

81.     Primacy has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Primacy's trade secrets, Defendants were unjustly enriched.

82.     The aforementioned acts of Defendants were willful, malicious and fraudulent. Primacy is therefore entitled to exemplary damages.

83.     Pursuant to the New Jersey Uniform Trade Secrets Act and related law, Primacy is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

84.     Defendants' misappropriation has caused and will continue to cause Primacy significant economic and competitive harm and irreparable injury. Primacy has no adequate remedy at law unless Defendants are enjoined from their wrongful conduct.  The equitable relief sought by Primacy includes but is not limited to the following:

      a.     An injunction barring SAN Engineering from using Primacy's proprietary information; and

      b.     An order requiring SAN Engineering to (1) destroy any proprietary information belonging to Primacy that is in SAN Engineering's possession,

(2) withdraw from any contracts with Hanjin for work relating to to the LSF-IIs, (3) withdraw any proposals it submitted to Hanjin for work relating to the LSF-IIs, (4) inform Hanjin that its proposals contained proprietary information belonging to Primacy, which SAN Engineering unlawfully used without Primacy's permission, and (5) terminate its contractual relationship with Lee.

### THIRD CLAIM FOR RELIEF

**Trade Secret Misappropriation Under the Texas Uniform Trade Secrets Act (Against Defendant JK Oceanic)**

85.     Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

86.     Primacy owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Simply by way of example, Primacy has trade secrets in its proprietary proposals (such as marketing material), its pricing information for the SWBD, and, indeed, the very business opportunity with Hanjin.

87.     Primacy's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

88.     Primacy has taken reasonable measures to keep such information secret and confidential.  Due to these security measures, Primacy's confidential and proprietary trade secret information is not available for others to use through any legitimate means.

89.     In violation of Primacy's rights, Defendants SAN Engineering and Lee misappropriated Primacy's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged above.  Defendants SAN Engineering and Lee used and disclosed Primacy's trade secrets to others, including Defendant JK Oceanics, without Primacy's express or implied consent, knowing, or with reason to know, that the knowledge of the trade secrets had

been acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, or was derived from or through a person who owed a duty to Primacy to maintain the secrecy of the trade secrets or limit their use.  JK Oceanics knew or should have known under the circumstances that the information misappropriated by Defendants SAN Engineering and Lee were trade secrets.

90.     Defendants have used, and continues to use, Primacy's trade secrets to pursue contracts with Hanjin without Primacy's consent.

91.     Misappropriating Primacy's trade secrets saved each of the Defendants substantial time and money in pursuing these contracts.

92.     Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Primacy's knowledge or consent.

93.     As a direct and proximate result of Defendants' conduct, Primacy is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.

94.     Primacy has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Primacy's trade secrets, Defendants were unjustly enriched.

95.     The aforementioned acts of Defendants were willful, malicious and fraudulent. Primacy is therefore entitled to exemplary damages.

96.     Pursuant to the Texas Uniform Trade Secrets Act and related law, Primacy is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

97.     Defendants' misappropriation has caused and will continue to cause Primacy significant economic and competitive harm and irreparable injury. Primacy has no adequate

remedy at law unless Defendants are enjoined from their wrongful conduct.  The equitable relief sought by Primacy includes but is not limited to the following:

      a.    An injunction barring SAN Engineering from using Primacy's proprietary information; and

      b.    An order requiring SAN Engineering to (1) destroy any proprietary information belonging to Primacy that is in SAN Engineering's possession, (2) withdraw from any contracts with Hanjin for work relating to to the LSF-IIs, (3) withdraw any proposals it submitted to Hanjin for work relating to the LSF-IIs, (4) inform Hanjin that its proposals contained proprietary information belonging to Primacy, which SAN Engineering unlawfully used without Primacy's permission, and (5) terminate its contractual relationship with Lee.

## FOURTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Economic Advantage

### (Under New Jersey Law Against Defendants SAN Engineering and Lee)

98.    Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

99.    Primacy's previous relationship with Hanjin makes it reasonably probable that Primacy would have entered into a further relationship with Hanjin, benefitting Primacy.

100.    SAN Engineering's and Lee's misappropriation and exploitation of Primacy's misappropriated was done with a conscious desire to prevent Primacy from securing contracts with Hanjin, and to allow SAN Engineering to secure contracts with Hanjin instead.  Alternatively, SAN Engineering and Lee knew that it was substantially likely that by using Primacy's misappropriated trade secrets, SAN Engineering would secure contracts with Hanjin, to the exclusion of Primacy.

101. In the absence of Lee's theft of Primacy's trade secrets and SAN Engineering's subsequent exploitation of those trade secrets, it is reasonably probable that Primacy would have received the anticipated benefit of a further contractual relationship with Hanjin.

102. SAN Engineering's and Lee's interference caused financial injury to Primacy in an amount to be proven at trial.

103. Primacy therefore seeks to recover its actual damages, including but not limited to lost profits and benefits of the contract and injury to reputation, as well as exemplary damages, prejudgment and post-judgment interest, and court costs.

## FIFTH CLAIM FOR RELIEF

### Breach of Contract

### (Under New Jersey Law Against Defendant Lee)

104. Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

105. On January 17, 2011, Lee executed the NDA with GMB-USA, Primacy's predecessor-in-interest. Primacy acquired the rights to the NDA through the Material Purchase Agreement executed between Primacy and GMB-USA. The NDA is an enforceable contract.

106. GMB-USA, and later Primacy, performed all of their obligations under the NDA, or were excused from performance.

107. Through the acts alleged above, including retaining Primacy's computer containing trade secret information and using that trade secret information for SAN Engineering's benefit and to Primacy's detriment, Lee breached Paragraphs 2 and 3 of the NDA.

108. As a result of Lee's misappropriation of Primacy's trade secrets, Primacy has been damaged in an amount to be proven at trial.

109. The NDA provides that for any disputes arising out of the NDA, the prevailing party is entitled to attorneys' fees and costs. Primacy has incurred, and continues to incur, attorneys' fees and costs to which it is entitled.

## SIXTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Business Relations

### (Under Texas Law Against Defendant JK Oceanics)

110.    Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

111.    Primacy's previous relationship with Hanjin makes it reasonably probable that Primacy would have entered into a further relationship with Hanjin.

112.    By contracting with SAN Engineering and Lee to exploit Primacy's misappropriated trade secrets, JK Oceanics acted with a conscious desire to prevent Primacy from securing contracts with Hanjin.  Alternatively, JK Oceanics knew that it was substantially likely that by participating in SAN Engineering's and Lee's exploitation of Primacy's misappropriated trade secrets, SAN Engineering would secure contracts with Hanjin, not Primacy.

113.    JK Oceanic's interference caused financial injury to Primacy in an amount to be proven at trial.

114.    Primacy therefore seeks to recover its actual damages, including but not limited to lost profits and benefits of the lost contracts and injury to reputation, as well as exemplary damages, prejudgment and post-judgment interest, and court costs.

## SEVENTH CLAIM FOR RELIEF

### Unfair Competition by Common Law Misappropriation

### (Under Texas Law Against Defendant JK Oceanics)

115.    Primacy repeats and incorporates by reference the allegations above, as if fully set forth here.

116.    Primacy owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  Simply by way of example, Primacy has trade secrets in its proprietary proposals (such as marketing material), its pricing information for the SWBD, and, indeed, the very business opportunity with Hanjin.

117.    Primacy created these trade secrets through extensive time, labor, skill, and money.

21

118.    Primacy's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

119.    Primacy has taken reasonable measures to keep such information secret and confidential. Due to these security measures, Primacy's confidential and proprietary trade secret information is not available for others to use through any legitimate means.

120.    JK Oceanic's use of Primacy's trade secrets through JK Oceanic's partnership with SAN Engineering provides JK Oceanic with a special advantage in competing against Primacy. JK Oceanic has borne none of the substantial time, expenses, and efforts incurred by Primacy in creating these trade secrets.

121.    JK Oceanic's use of the trade secret information has caused damage to Primacy in an amount to be proven at trial.

## CONDITIONS PRECEDENT

122.    All conditions precedent to Primacy's claims have occurred or been performed.

## JURY DEMAND

123.    Primacy hereby demands a jury trial on all triable issues.  FED. R. CIV. P. 38(b).

## PRAYER FOR RELIEF

Wherefore, Primacy respectfully requests that this Court enter judgment in its favor and against Defendants and grant the following relief:

1.    Judgment in Primacy's favor and against Defendants on the causes of action alleged above;

2.    For damages in an amount to be further proven at trial;

3.    For preliminary and permanent injunctive relief;

4.    For judgment that this is an exceptional case;

5.    For punitive damages;

6.    For restitution;

7.    For costs of suit incurred herein;

8.      For prejudgment interest;

9.      For a finding that Defendants are jointly and severally liable;

10.     For attorneys' fees and costs; and

11.     For such other and further relief as the Court may deem to be just and proper.


Respectfully submitted,

JACKSON WALKER, LLP

By: */s/ Jorge A. Padilla*
Jorge A. Padilla
TSBN 24054512
jpadilla@jw.com
Scott W. Weatherford
TSBN 24079554
sweatherford@jw.com
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone: (512) 236-2000
Facsimile: (512) 266-2002

-and-

KELLER/ANDERLE LLP

Jesse Gessin, *pro hac vice to be filed*
California SBN 263889
jgessin@kelleranderle.com
Michael A. Schachter, *pro hac vice to be filed*
California SBN 298610
mschachter@kelleranderle.com
18300 Von Karman Avenue, Suite 930
Irvine, California 92613-1057
Telephone: (949) 476-8700
Facsimile: (949) 476-0900

**ATTORNEYS FOR PLAINTIFF PRIMACY
ENGINEERING, INC.**

19873098v.3