## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **PRIMACY ENGINEERING, INC.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 1:18-cv-00129-RP** |
| | § | |
| **SAN ENGINEERING; CHI WON LEE, an** | § | |
| **individual; JK OCEANICS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT SAN
## ENGINEERING'S MOTION TO DISMISS

Plaintiff Primacy Engineering, Inc. ("Primacy") files this Response to Defendant SAN Engineering's ("SAN") Motion to Dismiss (the "Motion"), and shows the Court as follows:

## I. SUMMARY OF RESPONSE

The Court has personal jurisdiction over SAN because SAN used and worked with Texas-based JK Oceanics, LLC ("JK Oceanics") to commit torts in Texas. Specifically, SAN stole Primacy's trade secrets and used them to wrongfully obtain a contract for South Korean military hovercrafts that Primacy otherwise would have been awarded. As part of the scheme, JK Oceanics was created to serve as a hub in Texas to obtain and ship parts that SAN needed to fulfill the contract it had obtained through theft. SAN sent purchase orders and payments to JK Oceanics in Texas, and JK Oceanics gathered the parts there and then shipped them to SAN. Moreover, SAN disclosed Primacy's proprietary part numbers to JK Oceanics in its effort to improperly obtain them. Because committing torts in Texas establishes minimum contacts, the Court has personal jurisdiction over SAN.

Moreover, SAN has failed to meet its burden for dismissal based on the common law doctrine of forum non conveniens.  SAN has failed to provide evidence that Korea is an adequate and available forum, or that the other factors weigh in favor of dismissal.  For these reasons, fully set forth below, SAN's motion should be denied.

## II. BACKGROUND

Primacy was formed in 2015.  In January, 2017, Primacy obtained certain assets from GMB-USA, Inc. ("GMG-USA"), including licenses and trade secrets, through a purchase agreement.  Before that transaction, GMB-USA had provided the South Korean Navy, through the company Hanjin, with electrical switchboards for LSF-II military hovercrafts.  Ex.1, Park Decl. ¶ 4–6.  GMB-USA created the technical package for those systems by modifying a data package obtained from the U.S. Navy.  *Id.* ¶ 7.  The data package, including schematics, equipment drawings, and technical operation descriptions, were GMB-USA's trade secrets.  *Id.* ¶ 7–8.

Around 2014, Hanjin contacted GMB-USA to determine the feasibility of production for additional hovercraft switchboards.  In approximately January 2016, the South Korean government budgeted for the additional hovercrafts, and Hanjin formally requested bids for the new switchboards in April 2017.  Ex.2, Oh Decl. ¶ 4.  The specifications for the solicited switchboards were identical to those supplied by GMB-USA.  *Id.*

At that point, Primacy was the *sole* legitimate owner of the data necessary for the contract, having purchased GMB-USA's proprietary trade secret information.  *Id.* ¶ 4, 6.  Moreover, because of GMB-USA's work, Primacy was a "preferred bidder."  This created a tremendous business opportunity for Primacy.  *See* Ex.1, Park Decl. ¶ 11.

Surprisingly, despite being the only entity with the legitimate ability to obtain and fulfill the contract, Primacy was not awarded it.  Instead, SAN won the contract by using trade secrets stolen by its co-defendant Chi-Won Lee.  Lee had been the team manager for GMB-USA's Defense Business Team starting in 2011.  *Id.* ¶ 3.  After Hanjin informed GMB-USA of its desire for additional hovercrafts, Lee left GMB-USA, taking his GMB-USA computer with him, and he and his company Oceanics entered into a business relationship with SAN.  *See* Ex.2.A.1, SAN Korean court briefing, p.10.  In his role at GMB-USA, he had access to the precise trade secrets that SAN needed to subsequently bid on the contract.  Ex.2, Oh Decl. ¶ 6–7.

 But possessing the stolen trade secrets via Chi-Won Lee and Oceanics was insufficient for SAN to obtain and carry out the contract—SAN would be unable to fulfill it without an entity based in the United States to obtain and ship it the necessary components.  Ex.2, Oh Decl. ¶ 9–13; Ex.3, Lee Decl. ¶ 8 (admitting components only available from the United States).  This is particularly true because legitimate companies based in the United States would not ship components to SAN in Korea; that would violate the International Traffic in Arms Regulations Act ("ITAR"), which promotes national security by restricting and controlling the export of defense and military-related technologies.  Ex.1, Park Decl. ¶ 5–7; Ex.2, Oh Decl. ¶ 9; 22 U.S.C. § 2778(b).

Hence, Texas-based JK Oceanics was created.  JK Oceanics was officially incorporated in Texas in March 2017, after it was known that Hanjin was going to request bids for new switchboards and immediately before the formal bid request in April 2017.  Ex.4, certificate of formation.  As the name suggests, JK Oceanics was founded as a Texas-based entity related to Lee's Korean entity Oceanics,[1] and was formed by another disgruntled former Primacy

---

[1] "JK" is simply the initials of the company's founder, Ji Kwon.

employee, Ji "Justin" Kwon.  *Id.*; Ex.1, Park Decl. ¶ 3.  It was founded to assist SAN on the contract at issue by shipping it parts that other companies would not ship SAN due to ITAR, 22 C.F.R. § 121.  *See* Ex.1, Park Decl. ¶ 5–7; Ex.2, Oh Decl. ¶ 9.

SAN's first purchase order was sent to JK Oceanics in December 2017, immediately after the contract was awarded to SAN.  Ex.5, correspondence between SAN and JK Oceanics, at 000006–07; Ex.3, Lee Decl. ¶ 11 (stating contract awarded to SAN in December 2017).  After SAN sent purchase orders and payments to JK Oceanics in Texas, JK Oceanics obtained the necessary switchboard components and sent them from Texas to SAN in South Korea.  Ex.5 at 000006–7, 33–43 (correspondence between SAN and JK Oceanics); *id.* at 000004, 10, 27, 47, 72, 82, 87, 91, 94, 97 (pro forma and commercial invoices from JK Oceanics to SAN), *id.* at 000011, 25–26, 44–45, 46, 85–86, 89–90, 98–100 (shipping information showing parts sent to SAN from Texas);[2] Ex.6, SAN response to Interrogatory #2 (listing parts received from JK Oceanics); Ex.7, Lee Depo. at p.17 l. 21–18 l. 22, (admitting components sent from JK Oceanics could be used for the contract at issue), 23 l.2–24 l.4 (describing how SAN's payment to JK Oceanics is built into quotes sent to SAN).[3]

JK Oceanics[4] was previously sent Primacy's proprietary parts numbers in order to obtain price quotes on them.  Ex.5, correspondence between SAN and JK Oceanics, at 000064–66;

---

[2] These documents include correspondence from a "marinedigitech" email.  This is a SAN email address.  Ex.7, Lee Depo., p.30 l.8–12.

[3] SAN characterized other components as being obtained to repair pre-existing hovercrafts under a different contract.  However, the same parts would be used for the contract at issue, and were sought by SAN after obtaining the contract at issue.  Ex.2, Oh Decl. ¶ 13; Ex.7, Lee Depo. at p.17 l. 21–p.18 l. 22 (admitting parts could be used for repair contract or new contract for switchboards).

[4] JK Oceanics was not yet incorporated, but the address on the documents corresponds to JK Oceanics.

Ex.2, Oh Decl. ¶ 11.  After discovering this attempt to steal its trade secrets, Primacy instructed the manufacturer of those parts, Microsemi, not to sell them to JK Oceanics.  SAN's subsequent purchase orders attempted to apply the stolen trade secrets by replicating the proprietary parts with standard, non-proprietary parts from the other component manufacturer, Safran.  Ex.2, Oh Decl. ¶ 13.

SAN continues to order the component parts from JK Oceanics, and its Managing Director visited Texas to meet with JK Oceanics as recently as February 2019.  *See* Ex.6, SAN's responses to Interrogatory #3; Ex.3, Lee Decl. ¶ 1 (identifying Myung Won Lee as SAN's Managing Director).

If SAN's carefully-executed scheme to use Oceanics and JK Oceanics to cut Primacy out of the Hanjin contract continues to succeed, it will be devastating to Primacy.  A critical part of Primacy's business operations depends upon its relationship with military contractors.  Ex.1, Park Decl. ¶ 11.  By far the most lucrative and important relationship for Primacy is Hanjin.  Loss of business with Hanjin could mean the end of Primacy.  *Id.*  The theft and use of Primacy's trade secrets by SAN and JK Oceanics to rob Primacy of a lucrative contract with Hanjin jeopardizes Primacy's relationship with Hanjin and could cause Primacy's downfall and the loss of twenty jobs.  *Id.*

### III. ARGUMENT AND AUTHORITIES

**A.     The Court has personal jurisdiction over SAN.**

The Court has personal jurisdiction over SAN.  SAN's tortious scheme to steal the contract by using Primacy's trade secrets was made possible through SAN's interactions with Texas-based JK Oceanics.  SAN used JK Oceanics to obtain and send components—that were needed to replicate trade secrets—to SAN from Texas at SAN's request.  Indeed, JK Oceanics was founded as part of SAN's scheme.  The Court should deny SAN's motion.

### 1.  Legal Standard.

When there is no evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, the nonmovant "need only make a prima facie showing, and the court must accept as true the nonmovant's allegations and resolve all factual disputes in its favor." *Cantu v. TitleMax*, No. 5:14–CV–628–RP, 2015 WL 4526987, at *2 (W.D. Tex. July 23, 2015) (citing *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999)).  Where an issue overlaps with the merits, it should be reserved for trial.  *See, e.g.*, *McBeath v. Inter-Am. Citizens for Decency Comm.*, 374 F.2d 359, 363 (5th Cir. 1967) (holding that where jurisdictional question is "inextricably connected with the merits" that it was error to dismiss the suit without "a full opportunity to prove his case on the merits").

The Court has personal jurisdiction over SAN "if the state's long-arm statute extends to the defendant and exercise of such jurisdiction is consistent with due process."  *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).  Because Texas's long-arm statute is coextensive with due process, the inquiry collapses into due-process analysis. *Id.*  Due process requires that the defendant have minimum contacts with the forum and that jurisdiction is consistent with fair play and substantial justice.  *Id.*

Minimum contacts can be based on specific jurisdiction.  Specific jurisdiction exists when the defendant "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities."  *Id.* (internal quotation marks omitted).  "When a nonresident defendant commits a tort within the state[], that tortious conduct amounts to sufficient minimum contacts."  *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 491 (5th Cir. 2018) (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007)) (internal formatting omitted).

6

After minimum contacts are established, the burden shifts to the defendant to make a "compelling case" that jurisdiction "is unfair and unreasonable." *Id.* Primacy has met its burden. SAN cannot meet its.

### 2.  The Court has specific jurisdiction over SAN.

### A.  SAN committed torts in Texas and minimum contacts exist.

Primacy has asserted three causes of action against SAN: (1) trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq.*; (2) trade secret misappropriation under the New Jersey Uniform Trade Secrets Act; and (3) tortious interference with prospective economic advantage under New Jersey law. All three arise from and relate to SAN's directing its activities at Texas by using JK Oceanics to obtain and ship it necessary components it needed to replicate trade secrets, when other companies would not, so that SAN could fulfill the wrongfully-obtained contract.

"When a nonresident defendant commits a tort within the state[], that tortious conduct amounts to sufficient minimum contacts." *Trois*, 882 F.3d 485 at 491 (quoting *Moncrief*, 481 F.3d at 314) (internal formatting omitted). SAN committed torts in Texas and this case concerns injuries arising out of and related to those tortious activities. The evidence demonstrates that SAN schemed to respectively use Chi-Won Lee and JK Oceanics to steal trade secrets belonging to Primacy and then use that stolen information to obtain necessary parts and ship them from Texas to South Korea. *See supra* Part II (Background). Although SAN denies those allegations in its motion to dismiss, it tellingly refused to disclose pertinent documents or information in the jurisdictional discovery the Court ordered on that motion. Ex.6, SAN's responses to Interrogatories; Ex.8, SAN's responses to requests for production (refusing to disclose any

communications that took place in South Korea).[5]  Moreover, SAN's declaration in support of its motion to dismiss omits critical information.  For example, SAN's declarant claimed that "SAN entered into a contract with Oceanics regarding a simulator project that is wholly unrelated to the Hanjin bid that Primacy is complaining about," Ex.3, Lee Decl. ¶6, but failed to disclose that Oceanics also provided quote information *for the LSF-II hovercraft components*.  *See* Ex.2.A.1, SAN Korean court briefing, p.10.

In any event, to the extent SAN continues to deny that it stole Primacy's trade secrets, that issue would be addressed at trial.  *See, e.g.*, *McBeath*, 374 F.2d at 363 (holding that where jurisdictional question is "inextricably connected with the merits" that it was error to dismiss the suit without "a full opportunity to prove his case on the merits").  Thus, the issue before the Court is simply the role of Texas in SAN's scheme.

The evidence demonstrates that Texas served as a crucial hub in that scheme: SAN could not carry out its plan to tortiously steal the contract away from Primacy without obtaining necessary components from the United States.  *See* Ex.3, Lee Decl. ¶ 8 (admitting components available only from the United States).  And legitimate companies would not ship those components to SAN in violation of ITAR.  *See* Ex.1, Park Decl. ¶ 5–7; Ex.2, Oh. Decl. ¶ 9.  SAN therefore used the stolen trade secrets, in violation of federal and New Jersey trade secrets law, to determine what parts it needed and sent purchase orders and payments to JK Oceanics in Texas in exchange for JK Oceanics obtaining those parts and sending them to SAN from Texas.  *See* Ex.2, Oh Decl. ¶ 6, 13; Ex.5, correspondence between SAN and JK Oceanics, invoices, and shipping information; Ex.6, SAN's response to Interrogatory #2.

---

[5] For example, SAN claims Hanjin authorized SAN to view the trade secrets at issue, but fails to disclose any such authorization—which would have been in violation of ITAR.

In addition, in order for SAN to obtain price quotes on Primacy's proprietary parts, those part numbers were sent to JK Oceanics in Texas.   *See* Ex.2, Oh Decl. ¶ 10–11; Ex.5, correspondence between SAN and JK Oceanics at 64–66.   Because those attempts to obtain proprietary parts failed, SAN's subsequent purchase orders attempt to use the stolen trade secrets to replicate Primacy's proprietary parts.   Ex.2, Oh Decl. ¶ 13.   By using the stolen trade secrets to functionally replicate proprietary parts via Texas, SAN created specific jurisdiction over Primacy's federal and New Jersey trade secrets claims.   Likewise, were it not for SAN's use of trade secret information in Texas to fulfill the contract, Primacy would be awarded that contract, which means that specific jurisdiction exists over the tortious interference claim.

Moreover, the evidence suggests that JK Oceanics was *formed* as part of this scheme.   JK Oceanics was officially incorporated in Texas in March 2017, after it was known that Hanjin was going to request bids for new hovercrafts and immediately before the formal bid request in April 2017.   *See* Ex.2, Oh Decl. at ¶ 4; Ex.4, certificate of formation.   Indeed, SAN's first purchase order was sent to JK Oceanics in late December 2017, the same month SAN wrongfully obtained the contract.   Ex.5, correspondence between SAN and JK Oceanics at 000006–7; Ex.3, Lee Decl. ¶ 11 (stating contract awarded in December 2017).

At this moment, Primacy should be using the trade secrets it owns to fulfill the switchboard contract.   Instead, SAN used the stolen trade secrets in Texas to obtain the necessary components via JK Oceanics.   Primacy has more than met its burden to demonstrate minimum contacts.   *See Trois*, 882 F.3d at 491 ("When a nonresident defendant commits a tort within the state[], that tortious conduct amounts to sufficient minimum contacts.") (quoting *Moncrief*, 481 F.3d at 314) (internal formatting omitted); *see also id.* at  491 ("When the actual content of

communications with a forum gives rise to intentional tort causes of action, this alone constitutes powerful availment.").

SAN claims that there are no minimum contacts because merely contracting with a forum-state resident does not establish minimum contacts. Motion to Dismiss at 7 (citing *360 Mortg. Group, LLC v. Stonegate Mortg. Corp.*, No. A–13–CA–942–SS, 2014 WL 2092496, at *4 (W.D. Tex. May 19, 2014)). But, to be clear, Primacy does not allege that minimum contacts exist merely based on a contract between SAN and JK Oceanics. Instead, as described above, minimum contacts exist because SAN committed a tort in Texas by using stolen trade secrets to obtain components via Texas to further SAN's scheme to steal the contract from Primacy. *See* Ex.5, correspondence between SAN and JK Oceanics, invoices, and shipping information.

Finally, SAN has asserted that the Fifth Circuit's *Trois* decision holding that commission of a tort in the forum establishes minimum contacts somehow applies to only fraud claims. Response to Plaintiff's Emergency Motion for Leave to Conduct Discovery at 4. SAN aggressively ignores the language of *Trois*, which approvingly quoted case law holding that "When a nonresident defendant commits a tort within the state[,] that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state to exercise personal adjudicative jurisdiction." *Trois*, 882 F.3d at 491 (internal formatting omitted). The *Trois* court likewise approvingly quoted precedent holding that "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes powerful availment." *Id.* The court then contrasted this analysis against a "*straight contract claim*," not non-fraud torts. *Id.* at 492 (emphasis added). *Trois* is fully applicable to the tort claims against SAN, and SAN's attempt to cabin it to fraud is telling.

### 3. SAN has not presented a compelling case that it would be unreasonable for this Court to exercise jurisdiction.

Having purposefully directed its activities to Texas, SAN must make a "compelling case" that jurisdiction "is unfair and unreasonable." *Id.* This is a "heavy burden." *S & D Trading Academy, LLC v. AAFIS, Inc.*, 494 F. Supp.2d 558, 569 (S.D. Tex. 2007). Indeed, it is a "rare case[]" where "fair play . . . defeat[s] the reasonableness of jurisdiction [when] the defendant has purposefully engaged in forum activities." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 116 (1987). SAN has not and cannot satisfy this stringent burden of proof.

To make this determination, courts balance (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies. *Id.* at 113. Although "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight," "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114.

SAN asserts that a "nearly identical lawsuit (minus JK Oceanics) seeking identical relief is pending and very close to trial in Korea." Of course, JK Oceanics is a central player in SAN's tortious scheme, so a "nearly identical" lawsuit without JK Oceanics is not nearly identical at all. Likewise, SAN's claim that Texas "has absolutely no interest in this case" is wrong as a matter of law. States have "a substantial interest in providing a forum to redress tortious injuries committed within [their] borders by non-residents." *Elkhart Eng'g Corp. v. Dornier Werke*, 343 F.2d 861, 868 (5th Cir. 1965). Here, Texas has a substantial interest in redressing SAN's use of Texas to carry out its tortious scheme.

SAN also claims that its officers and employees "all speak Korean." Motion to Dismiss at 8. This is unsupported by any evidence, and fails to specify whether they additionally speak English. And SAN's declaration from its Managing Director used to support the instant motion is in fluent English.[6] SAN also claims that travel for trial depositions would be burdensome, but ignores the fact that depositions can be taken anywhere or by video. *See, e.g.*, *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1363 (Fed. Cir. 2001) ("Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.").[7] Indeed, SAN wholly fails to discuss the well-established principle that "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) (quotation marks omitted). Indeed, SAN's Managing Director and apparent primary witness already participated in a remote deposition in this case, Ex.9, Depo. Notice; Ex.7, Lee Depo. p.1–4.

And while SAN's declarant inexplicably claimed it would be disruptive and prohibitively costly for *all 67* of its employees to travel to Texas for depositions and trial, he failed to identify which of those 67 employees would actually have information necessary to the trial of this case.

---

[6] At his deposition, SAN's Managing Director claimed his English was a "little deficient," but that he used software to translate his declaration. Ex.7, Lee Depo. P.10 l.21–p.11 l.1. SAN cannot have it both ways. SAN's declaration demonstrates either (a) there is no language barrier; or (b) the language barrier is not an issue due to the ease of translation using modern technology.

[7] *See also Patent Enf't. Grp., LLC v. Chassis Tech, LLC*, No. 3:11–CV–925–BR, 2012 WL 12678, at *6 (D. Or. Jan. 3, 2012) ("Plaintiff may take depositions of MAS witnesses in a location convenient to MAS, and the Court can take testimony by remote means if necessary.").

Moreover, SAN's declarant and Managing Director just travelled to Texas to meet with JK Oceanics in February 2019.  Ex.6, SAN's response to Interrogatory #3.

SAN is left with the argument that "[a]ll, or nearly all" of its documents are in Korean and would have to be translated.  To begin with, SAN fails to specify which documents would be relevant, and which of those documents would have to be translated.  And because the case against JK Oceanics is ongoing, even if those documents were all in Korean, they would need to be translated even absent SAN's presence in the lawsuit.  Regardless, the fact that documents would need to be translated fails to satisfy SAN's heavy burden to show a compelling case that it can avoid Texas courts despite sending its trade secrets to Texas and using Texas-based JK Oceanics to ship it the parts necessary to carry out its tortious scheme.

**B.**     **SAN has not met its burden to dismiss Primacy's claims based on *forum non conveniens.***

Under the common-law doctrine of *forum non conveniens*, the district court "may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum."  *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 828 (5th Cir. 1993).  The doctrine is a "flexible" one, with the court weighing multiple factors relating to fairness and convenience based on the particular facts of the case in deciding the motion.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249–50 (1981) ("[e]ach case turns on its facts").  Indeed, the Supreme Court has cautioned that "[i]f central emphasis [is] placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable."  *Id*.

The moving party bears the burden of persuasion when invoking the *forum non conveniens* doctrine.  *Camejo v. Ocean Drilling & Expl.*, 838 F.2d 1374, 1379 (5th Cir. 1988).

"This burden of persuasion runs to all the elements of the *forum non conveniens* analysis." *In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1164 (5th Cir. 1987), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989). The moving party must therefore demonstrate (1) the existence of an adequate alternative forum and (2) that the balance of relevant private and public interest factors favor dismissal. When—as here—the plaintiff is an American citizen or resident, the plaintiff's choice of forum is accorded significant deference and "should rarely be disturbed" by dismissal of the action on *forum non conveniens* grounds. *Piper Aircraft*, 454 U.S. at 241. A plaintiff should not be deprived of the advantages of its home jurisdiction except on a clear showing of facts that either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to the plaintiff's convenience, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown").

Contrary to SAN's suggestion, Motion to Dismiss at 10, an American plaintiff's choice of a U.S. court is afforded this deference regardless of whether the plaintiff resides in that forum or in another location in the U.S. *See, e.g., Adelson v. Hananel*, 510 F.3d 43, 53 (1st Cir. 2007) ("home forum" for U.S. plaintiff is any federal district in U.S., not particular district where plaintiff lives); *Tempur-Pedic Int'l., Inc. v. Go Satellite Inc.*, 758 F.Supp.2d 366, 379 n.6 (N.D. Tex. 2010) ("[S]everal courts have held that the home forum for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives.") (internal formatting omitted); *Snaza v. Howard Johnson Franchise Sys., Inc.*, No. 3:07–CV–0495–O,

2008 WL 5383155, at *11 (N.D. Tex. Dec. 24, 2008) ("In a *forum non conveniens* case involving a motion to dismiss the case in favor of a foreign court, the 'home forum' for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives.").

### 1.      Korea is not an adequate and available alternative forum.

SAN summarily concludes—without any supporting argument or evidence—that "Plaintiff cannot contest that Korea is an adequate forum since it has already sued SAN there." *See* Motion, p. 10.  Yet this conclusion assumes that Korea is an "adequate" forum without any discussion about whether Korea is an "available" forum.  *See Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671–672 (5th Cir. 2003) ("Forum availability and adequacy are separate inquiries, however, so we reject plaintiffs' attempt to bootstrap the two.").

In fact, the Court should not even reach that issue because Korea is not an available forum to begin with.  "An alternative forum is considered available if the ***entire case*** and ***all parties*** can come within its jurisdiction." *Vasquez*, 325 F.3d at 671 (emphasis added).  SAN has made no effort to demonstrate this entire case could proceed in Korea and, specifically, that JK Oceanics would be subject to jurisdiction in Korea.  This is fatal to SAN's argument.  *See e.g., Adhikari v. Daoud & Partners*, No. 09–cv–1237, 2011 WL 13261998, at *17 (S.D. Tex. Dec. 12, 2011) (denying *forum non conveniens* motion where one defendant was not subject to jurisdiction in the alternate forum).

### 2.      The private interest factors do not favor dismissal.

If a court determines there is an available ***and*** adequate alternative forum, it may then proceed to balance whether the private interest factors weigh in favor for or against dismissal. *Vasquez*, 325 F.3d at 672. Relevant private factors include: (1) the plaintiff's forum choice; (2) access to sources of proof; (3) availability of compulsory process to ensure attendance of

unwilling witnesses; (4) possibility of viewing premises, if viewing is appropriate in the litigation; and (5) other practical problems that affect the trial, including enforceability of judgment and whether the plaintiff has selected an improper forum to harass the defendant. *Id.*; *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) superseded by statute on other grounds as recognized in *Hartford Fire Ins. Co. v. Westinghouse Elec. Corp.*, 725 F.Supp. 317 (S.D. Miss. 1989).

**Plaintiff's forum choice.**   There is a "strong presumption in favor of the plaintiff's choice of forum that may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987) (citing *Piper*, 454 U.S. at 255). "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508.  Primacy's decision to initiate this litigation in the home forum of a United States District Court is therefore entitled to strong deference.

**Ease of access to proof**.  SAN overstates its case by claiming that "no witnesses are here, no documents are here and nonparties . . . are certainly not here." Motion, p. 11.  JK Oceanics— a Texas company—is central to Primacy's allegations; Primacy's lawsuit therefore involves claims regarding the conduct of a Texas company and acts in and directed at Texas.  Necessarily, the lawsuit will likely involve witnesses located in the United States, including the following:

– JK Oceanics representatives, who are located in Texas.

– Officials from the United States Department of State, which is the licensing authority for the export of military components under the Arms Export Control Act, 22 U.S.C. § 2778 *et seq*. ("AECA") and ITAR.

– Employees and personnel of Microsemi and Safran Electrical and Power, who are located in the United States and supply component parts for the type of military equipment at issue in this lawsuit.  *See* Ex.2, Oh Decl. ¶ 10–13; Ex.3, Lee Decl. ¶ 8.

–   Primacy's U.S. employees.

The fact that SAN itself is located in Korea should have limited effect: SAN can arrange for the willing attendance in this Court of any employees or affiliate witnesses. *See, e.g., Raytheon Eng'rs & Constructors, Inc. v. HLH & Assocs.*, 142 F.3d 1279 (5th Cir. 1998) (per curiam) (recognizing that witnesses located in Panama were "readily available to attend court in Houston" when they were defendant's employees). Significantly, SAN's Managing Director and apparent primary witness just travelled to Texas this February, Ex.6, SAN response to Interrogatory #3, and already participated in a remote deposition in this case, Ex.9, Depo. Notice; Ex.7, Lee Depo. p.1–4.

Similarly, significant documents relating to the conduct and activities of JK Oceanics, including interactions with the United States Department of State, are already located in Texas. Any other documents possessed by SAN or Defendant Lee can be ordered to be produced by this Court. *See Prevision Integral de Servicios Funerarios, S.A. v. Kraft*, 94 F. Supp. 2d 771, 777 (W.D. Tex. 2000) (holding that court could compel party over whom it had jurisdiction to produce any relevant materials in party's control). At most, this factor is neutral. *See Bund Zur Unterstutzung Radargeschadigter E.V. v. Raytheon Co.*, No. EP-04-CV-127-PRM, 2006 WL 3197645, at *7 (W.D. Tex. Aug. 30, 2006).

**Compulsory process, and the cost of willing witnesses to attend.** SAN has offered no evidence that it would be more costly or inconvenient for SAN to bring itself and its witnesses to the United States than for the United States-based witnesses to travel to South Korea. Nor has SAN produced any evidence that the witnesses outside of its control are unwilling to attend trial in the United States. Further, the same arguments made by SAN would apply if this case proceeded in Korea (*e.g.*, Korea would be unable to subpoena a potentially unwilling witness in JK Oceanics). When "the availability of compulsory process would be a challenge in either

forum," that factor "does not weigh in favor of dismissing the case." *Bund Zur Unterstutzung*, 2006 WL 3197645, at *8 (noting that while "relevant witnesses in Germany might not be willing to testify and are potentially beyond the reach of the Court, . . . dismissal would only serve to replicate this obstacle, making it the problem of the German courts" to compel U.S. witnesses not under the control of any of the parties).

**Practical Problems**.  SAN's sole argument here is that it would be "counterproductive" to "engage in the exact same litigation in Texas when they have already done so in Korea." Motion, p. 12.  But as described above, JK Oceanics is not a party to the Korean litigation, and SAN's witnesses and documents would still be necessary in the Texas litigation even if SAN was not a party.

### 3.    The public interest factors do not favor dismissal.

The public-interest factors include: "the administrative difficulties flowing from court congestion; the local interest in having localized controversies resolved at home; the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."  *Festor v. Wolf*, 647 F. Supp. 2d 750, 753 (W.D. Tex. 2009).  If these factors weigh in the movant's favor, the court may dismiss the case.  *Id*.  The movant has the burden of proving that the public-interest factors favor dismissal.  *Id*.

**Congestion.**  This Court must consider its own docket and what, if any, "administrative difficulties" will ensue from resolving this case in this Court.  *See Air Crash Disaster*, 821 F .2d at 1158.  Here, SAN has not produced any evidence that Korean court dockets are any less congested than this Court's docket.  The absence of any such evidence negates this factor.  *See*

*Prevision Integral*, 94 F. Supp. 2d at 780–81 (finding that, because defendant offered "no evidence to support her bald conclusion" that the Western District's docket is severely more congested than the dockets of the Mexican courts, the court could not make an "informed comparison or balance"); *Bund Zur Unterstutzung*, 2006 WL 3197645, at *10 (declining to factor court congestion into analysis when defendants had not provided any evidence of size or magnitude of German dockets in comparison to case load in Western District of Texas).

**Local Interest**.  SAN significantly understates the role of JK Oceanics and, therefore, Texas, in this lawsuit.  JK Oceanics is a critical figure in this lawsuit.  Indeed, SAN's activities with JK Oceanics are part of the alleged misappropriation and use of trade secrets to prevent the award of the contract to Primacy, that is, part of the wrongs giving rise to Primacy's claims.  As noted by this Court in denying JK Oceanic's prior Motion to Dismiss under Rule 12(b)(6), "Primacy does not merely allege that JK Oceanics is selling parts to SAN; it alleges that JK Oceanics knew it was misappropriating Primacy's trade secrets—which would constitute an independent tort—in order to secure and deliver parts to SAN, and that in doing so, it would help SAN 'secure contracts with Hanjin' rather than Primacy."  *See* ECF No. 23, at 6.  Contrary to SAN's arguments, JK Oceanics committed independent torts in Texas and facilitated  SAN's tortious activity in Texas.  The "United States and Texas have very strong interests in adjudicating Plaintiff's contentions that Defendant violated Texas laws by using instrumentalities of United States commerce" to harm a plaintiff.  *Prevision Integral*, 94 F. Supp. 2d at 781; *see also Bund Zur Unterstutzung*, 2006 WL 3197645, at * 11.

**Controlling Law**.  Primacy's claims against SAN are governed by U.S. and New Jersey law.  There is no indication that this Court will have to apply or interpret Korean law, so there is no potential foreign conflict of law issue.  Nor does SAN assert that choice of law principles will

come into play.  *See* Motion to Dismiss at 13–14 (noting it is unclear whether there would be any conflict of laws).  Moreover, interpretation and application of the United States Arms Export Control Act will be important to this dispute.  The Court's familiarity with the controlling law in this case therefore cuts against SAN's arguments in favor of dismissal.

**Jury Duty.**  This case does not unduly burden the citizens of this District with jury duty. Jury duty should not be imposed on a community with "***no*** relation to the litigation.''  *Air Crash Disaster*, 821 F.2d at 1158.  SAN not only understates this lawsuit's connection to Texas, but wholly ignores its impact on United States homeland security.  Again, an issue in this case is the application and enforcement of the Arms Export Control Act, which governs the import and export of defense articles and defense services to foreign nations.  The citizens of the United States undoubtedly have a vested interest when a foreign corporation misappropriates trade secrets and uses a Texas company to violate the regulations governing the export of military secrets.  This factor, and those referenced above, do not weigh in favor of dismissal.

## CONCLUSION AND PRAYER

The Court should deny SAN's Motion.  Primacy has made a *prima facie* case of personal jurisdiction supported by facts and allegations showing that SAN purposefully directed tortious conduct in Texas.  Moreover, SAN has not established *forum non conveniens*, as set forth above.

Respectfully submitted,

KELLER/ANDERLE LLP

By: */s/ Michael A. Schachter*
Michael A. Schachter
*Admitted Pro Hac Vice*
California Bar No. 298610
*mschachter@kelleranderle.com*
18300 Von Karman Avenue, Suite 930
Irvine, California 92613-1057

Telephone: (949) 476-8700
Facsimile: (949) 476-0900

-and-

JACKSON WALKER, LLP

Jorge A. Padilla
Texas Bar No. 24054512
*jpadilla@jw.com*
Scott W. Weatherford
Texas Bar No. 24079554
*sweatherford@jw.com*
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone: (512) 236-2000
Facsimile: (512) 266-2002

**ATTORNEYS FOR PLAINTIFF PRIMACY
ENGINEERING, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th of May, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will electronically mail notification of such filing to all counsel of record who have appeared in this case:

David J. Park
*dpark@parkjunlaw.com*
Park & Jun, PLLC
2000 Royal Lane, Suite 204
Dallas, Texas 75229
Tel:  972-241-6900
Fax:  214-257-8633

COUNSEL FOR DEFENDANTS
SAN ENGINEERING & JK OCEANICS, LLC

*/s/ Jorge A. Padilla*
Jorge A. Padilla

22